Filed 7/29/21  In re M.E. CA2/5

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION FIVE

| | |
|---|---|
| In re M.E. et al., Persons Coming Under Juvenile Court Law. | B308143 c/w B307165 |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, | (Los Angeles County Super. Ct. No. 19CCJP07888A-C) |
| Plaintiff and Respondent, | |
| v. | |
| A.E. et al., | |
| Defendants and Appellants. | |

APPEAL from orders of the Superior Court of Los Angeles County, Craig S. Barnes, Judge.  Affirmed.

Janette Freeman Cochran, under appointment by the Court of Appeal, for Defendant and Appellant A.E.

Patricia K. Saucier, under appointment by the Court of Appeal, for Defendant and Appellant G.E.

Rodrigo A. Castro-Silva, County Counsel, Kim Nemoy, Assistant County Counsel, and Veronica Randazzo, Deputy County Counsel, for Plaintiff and Respondent.

_____

**INTRODUCTION**

Mother and father appeal after the juvenile court declared their three children dependents of the court by sustaining a petition pursuant to Welfare and Institutions Code section 300, subdivisions (b)(1) and (j), removed their eldest child from their custody, and denied father's section 388 petition.[1] They argue there was insufficient evidence that they medically neglected their eldest child or that father had mental and emotional problems that endangered the children. We affirm based on substantial evidence of medical neglect.

*FACTUAL AND PROCEDURAL BACKGROUND*

At the inception of this dependency case, father G.E. and mother A.E. had been married for 14 years and had three children together, M.E. (born 2010), a son (born 2013) and a daughter (born 2015). (We will refer to M.E.'s brother and sister as "siblings.") All three children are at issue in this appeal. Father also had four older children from two prior relationships, who are not involved in the appeal.[2] Father was the primary caregiver for his three youngest children, and mother worked full time.

M.E. was born prematurely at 26 weeks gestation. He has multiple complex medical problems that require a high degree of specialized care. His conditions include chronic lung disease,

---

[1] All subsequent statutory references are to the Welfare and Institutions Code.

[2] Father's children from other relationships consisted of an adult son who was in the military and did not reside in the family home, an adult daughter who did not reside in the family home, a 17-year-old daughter who had recently been staying in the family home on the weekends, and an adult son who lived in the family home full time.

2

ventricular septal defect, hip dysplasia, hypotonic cerebral palsy, undescended testes, hypothyroidism, and developmental delays. He required feedings through a gastrostomy tube (G-tube).  M.E. previously had a tracheostomy tube to assist with breathing, but it was removed in May 2018.  The opening for the tracheostomy (the stoma) never closed following the removal surgery.

The siblings do not have any medical conditions of note.

In summarizing the pertinent facts below, we adhere to the rule that requires us to " 'draw all reasonable inferences from the evidence to support the findings and orders of the dependency court' " and to " 'review the record in the light most favorable to the court's determinations.' " (*In re R.T.* (2017) 3 Cal.5th 622, 633.)

### 1.    *Referral for Medical Neglect*

On November 19, 2019, the Los Angeles County Department of Children and Family Services (DCFS) received a referral alleging general neglect of the parents' three children. The referral alleged that nine-year-old M.E. suffered from malnutrition and was very underweight.  The referral also alleged M.E. had missed eight medical appointments from 2016 to 2018.

On November 19, 2019, when DCFS began its investigation, father declined to be interviewed, but permitted the DCFS social worker to enter the family home and visually inspect the home and children.  Father said M.E. had not returned to school in August that year due to illness and doctor appointments.  Father declined to provide other information.

On November 20, 2019, the social worker spoke with M.E.'s nutritionist/dietician.  When the nutritionist saw M.E. in January 2018, he was mildly malnourished.  The family failed to attend M.E.'s December 2018 nutritionist appointment, and parents did not return the nutritionist's call when she tried to

follow up. The family also had a "team" appointment in June 2019, but was a no-show. When the nutritionist saw M.E. in October 2019, he was severely malnourished based on his BMI measurements.

DCFS interviewed school officials. M.E.'s school reported concern about M.E.'s weight loss the prior year. School staff stated that parents were giving M.E. a different amount of formula than listed on the doctor's protocol letter because parents felt M.E. was eating too much. Staff also said that the G-tube was not moving the formula smoothly and the family would not address the issue with their doctor. The family "had issues with 'following up' regarding medical visits and medical vendors last school year."

School attendance was problematic. M.E. had not attended school from August 2019 to November 2019 (when DCFS interviewed staff). M.E. needed doctor-approved feeding instructions in order to return to school but M.E.'s primary care doctor would not sign the instructions without first evaluating M.E. Parents did not bring M.E. to a follow-up appointment to obtain the signed instructions.

The siblings had many absences in the 2018-2019 school year. Their attendance had improved in 2019-2020, but they regularly arrived two hours late to school. The siblings also had not had a dental checkup in two years.

Parents denied medically neglecting M.E. They attributed missed appointments to scheduling conflicts and difficulty obtaining appointments with a busy doctor. They attributed M.E.'s weight loss to M.E. pulling out his G-tube.

**2. *Medical Examination and Removal***

On November 25, 2019, DCFS petitioned for, and the juvenile court granted, an investigative search warrant with a medical examination. On December 2, 2019, DCFS executed the

4

warrant, inspected the home, and took M.E. to the hospital for an examination. M.E. weighed 12.9 kg and appeared dirty and malodourous. The physical exam revealed an ulcer on his back.[3] M.E. also had a neck stoma with no tracheostomy tube in place.

Mother explained to hospital staff that she had been unable to care for M.E. the past 10 days because she was suffering from cellulitis. Mother stated father was afraid to bathe or care for M.E. because he did not want to break the G-tube or harm the stoma in M.E.'s neck. Mother disclosed that M.E. was losing weight because he was pulling out his G-tube while asleep. Formula was all over the sheets in the morning. Mother stated the neck stoma was supposed to close on its own, and that the stoma sometimes secreted mucus. Mother stated that M.E. had the back ulcer/lesion since he was discharged from the neonatal intensive care unit when he was a year old, but she had been told it did not require any care. Mother acknowledged that M.E. was not currently attending school because of inadequate transportation, and for that same reason, his attendance was irregular when he did attend.

The hospital admitted M.E. for wound care, nutrition optimization, and evaluation for neglect.

While M.E. remained in the hospital, both parents declined forensic exams and interviews for the siblings. On December 6, 2019, DCFS sought and the court issued a protective custody warrant for all three children. When the social worker and law enforcement served the removal order, the siblings were not home and parents refused to disclose their whereabouts.

---

[3]     Doctors subsequently determined that M.E. did not suffer from an ulcer, but a sacral lesion of unknown etiology that was more chronic in nature.

5

On December 9, 2019, after a week in the hospital, M.E. was medically cleared for discharge. DCFS placed M.E. in a care facility.

**3.      *Section 300 Petition and Detention***

On December 10, 2019, DCFS filed a section 300 petition alleging M.E. and his siblings came within the juvenile court's jurisdiction pursuant to subdivisions (b)(1) and (j). In identical counts, DCFS detailed that parents medically neglected M.E. by failing to properly feed him and missing numerous medical appointments, and that these failures endangered M.E. and placed the siblings at risk of harm. Specifically, the counts stated:

> "The children [M.E., and the siblings'] mother . . . and the father . . . medically neglected [M.E.], in that the mother and father repeatedly failed to properly feed [M.E.] adequate amounts of food as recommended by the child's physician, resulting in the child losing weight resulting in the child being diagnosed with Failure to Thrive. The child's weight is consistent with malnutrition and the child's weight being 12.9 [kg] which is 0% on the growth chart. In October 2019, the child was observed being severely malnourished by the child's medical provider due to the child being underfed, undernourished and being fed an inadequate diet, while in the care, custody, and control of the child's mother and father. Additionally, the mother and father have missed numerous appointments with the child's medical provider, including follow up appointments with the child's specialist on 11/18/19, 10/16/19, and 6/2019. The child's G-tube was not moving the child's formula smoothly and the mother and father failed to address

6

the matter with the child's medical provider. On 12/2/19, the child was admitted into the hospital due to the child being observed to have a decubitus ulcer/lesion on the child's back and G-tube dysfunction. The child's failure to thrive condition is due to environmental causes and no organic cause for the child's condition has been identified. Such failure of the mother and father to properly feed the child endangers the physical and emotional health and safety of the child and places the child and the child's siblings . . . at risk of physical and emotional harm, damage and danger."

On December 11, 2019, the juvenile court held the initial detention hearing. At the time, M.E. was nine years old. Parents testified that the siblings were in San Diego with a paternal aunt.[4] The juvenile court detained the children from mother and father, and issued protective custody warrants for the siblings. The following day, the children appeared in court and the warrants were recalled. DCFS placed the children together in a foster home.

### 4. Statements from M.E.'s Medical Providers

#### a. The Primary Care Doctor

When interviewed by DCFS in January 2020, M.E.'s primary care doctor stated she had concerns about M.E.'s weight when she saw him in November 2018. At that time, she told parents to return for a follow up two months later. Parents did not schedule the recommended appointment. Despite the doctor's referrals to a pediatric surgeon for M.E.'s tendency to pull out his

---

[4]     The parents initially provided the court with an inaccurate address. Upon further probing, they identified the siblings' location.

G-tube and for his undescended testes, parents did not schedule an appointment. Parents also failed to schedule needed appointments with pulmonary care, ear nose and throat, audiology, optometry, neurology, orthopedic, and dental pediatric specialists. Parents did not bring M.E. to his June 2018 appointments with pulmonary care and the nutritionist. When parents were contacted via telephone and by letter regarding the missed appointments, the office received no response.

The doctor next saw M.E. in October 2019 and at this time, she observed that M.E.'s "weight gain velocity" was inadequate over the preceding 21 months. M.E. had become "severely malnourished." At this appointment, she prescribed a higher caloric formula for M.E. A month later, when the doctor inquired, father stated the family had not obtained the formula because they did not answer the formula provider's phone call to confirm delivery.

Parents then contacted the primary care physician and insisted she sign a school form with M.E.'s medical update and feeding schedule. The doctor was unable to complete and sign the form until both she and the nutritionist saw M.E.

b. *The Nutritionist*

In a January 2020 interview with DCFS, the nutritionist echoed the primary care doctor's concerns. She reported that on January 16, 2018, M.E.'s weight was 13.7 kg (30.2 pounds), his height was 103.5 cm, and his BMI was 13.56 kg/m$^2$; he had mild malnutrition. Parents failed to bring M.E. to his December 20, 2018 appointment. The nutritionist last saw M.E. on October 3, 2019, when his weight had increased only 0.2 kg in nearly two years to 13.9 kg (30.6 pounds), his height was 106.1 cm, and his BMI was 12.35 kg/m$^2$. At that point, M.E. was "severely malnourished," and both his linear growth velocity and weight gain velocity were inadequate for his age. The nutritionist stated

8

that parents did not take M.E. to pediatric surgery specialists for G-tube follow-up appointments.

### c. *The Admitting Physician*

In January 2020, DCFS interviewed the physician who had examined M.E. and admitted him into the hospital for the lesion on his back and malnutrition. The physician said M.E.'s G-tube was very dirty—the taping was packed on and black. Upon his admission, hospital staff put mesh tape on the G-tube and dressed M.E. in a onesie. With these changes, M.E. did not remove the G-tube. The physician expressed concern that parents did not seek medical attention for M.E. despite observing him remove his G-tube.

The physician also stated that parents failed to take M.E. to follow-up appointments after the May 2018 removal of his tracheostomy tube. She expressed concerns that "his trach surgery site . . . is open and needs to be surgically closed." M.E. also required surgery for his undescended testicles, a condition that had been long outstanding.

The physician said M.E.'s medical records from age three or four indicated he was in the 40th percentile for weight, but had not gained weight since that age. Yet, in the month following his removal from parents' care, M.E. had gained 10 pounds. The physician had "high concern[s] regarding medical and educational neglect."

M.E. thrived in the first four months following detention. He was gaining mobility and learning to walk. By March 2020, M.E. was using a walker, and he could "cruise" without the walker while holding onto furniture. M.E. weighed 18.59 kg (41 pounds), and he was 106.68 cm tall. M.E. weight had increased by nearly one-third from October 2019. M.E. received his feedings by bolus (syringe) without incident.

9

The physician concluded that M.E. had suffered from medical and educational neglect. To the extent parents blamed M.E.'s failure to thrive because he pulled at his G-tube and was prescribed a pump that delivered the formula too slowly day and night, the physician explained that these feeding issues could have been resolved if parents had kept M.E.'s medical appointments. She also stated she was not sure how the pump could have caused M.E. to fail to thrive because he should have been receiving the same amount of formula regardless of the timing.

### 5.    *Father's Mental Health*

Cindy and Stacey, respectively father's adult and 17-year-old daughter from another relationship, reported to DCFS that father was paranoid, had hallucinations, and hoarded. They disclosed that father believed there were holes and tunnels in the family home, and maternal grandfather was digging them. They stated that father dug a hole in the bedroom to find the tunnels, but that hole had since been patched up. On February 3, 2020, DCFS filed a first amended section 300 petition adding an additional allegation to the subdivision (b)(1) count that father demonstrated mental and emotional problems that rendered him incapable of providing regular care for the children.[5] As we ultimately conclude that jurisdiction was properly sustained based on parents' medical neglect of M.E., we do not provide additional details on father's mental condition.

### 6.    *Jurisdictional Hearing*

On July 13 and 29, 2020, the juvenile court held the jurisdictional hearing. The court admitted into evidence DCFS's

---

[5]     We refer to the counts as (b)-1 for the medical neglect, (b)-2 for the mental health allegations, and (j) for jurisdiction based on conduct involving a sibling.

10

reports, and documents from parents. Parents testified consistently with their previous statements to DCFS. Father confirmed that he took a G-tube refresher course, was participating in a parenting education course, and was enrolled in individual counseling. Older daughter Stacey testified about father's mental health.

DCFS and counsel for the children asked the court to sustain the section 300 petition in its entirety. Mother and father asked the court to dismiss the petition. Parents argued they understood M.E.'s medical needs and appropriately fed him, and that the new bolus feeding regimen caused M.E.'s weight gain after his detention. Parents attributed M.E.'s weight issues to failures by his medical team. They did their best to keep M.E.'s medical appointments. Mother argued the siblings were differently situated because they did not suffer from any medical conditions that placed them at risk. Parents argued that the fact that siblings had missed school and dental appointments was insufficient to sustain jurisdiction. Regarding the mental health allegations, father asserted that there was no causation between any alleged paranoia or mental deterioration and risk to the children.

The juvenile court sustained the amended counts (b)-1, (b)-2, and (j) as pled. The court stated the evidence showed that from "January 2018 to deep into October – deep in 2019, [M.E.] went from mildly malnourished to severely malnourished." The court expressed concern that parents had missed important medical appointments, despite knowing they were difficult to make. These missed appointments contributed to the deterioration of M.E.'s health to the point he became severely malnourished. The court found parents failed to recognize the urgency of M.E.'s persistent medical needs, and stay proactive about M.E.'s treatment.

11

The juvenile court also sustained the (j) count as to the siblings. The court found that the parents' failure to meet M.E.'s needs showed that the siblings were similarly at risk. The family had difficultly balancing the demands of school and health appointments for all the children. The overall context and circumstantial evidence was sufficient to sustain the (j) count.

In sustaining the (b)-2 count related to father's mental health, the juvenile court acknowledged that father denied experiencing hallucinations or other mental illness. The court found Stacey's testimony to be compelling, extremely credible, and detailed in her description of father's paranoia and general deterioration of his mental state. Father's mental deterioration coincided with and contributed to M.E.'s declining condition. As father's mental health worsened, father struggled to balance the needs of all three children.

### 7.    *Dispositional Hearing*

The dispositional hearing occurred on August 27, 2020. The juvenile court admitted into evidence the DCFS reports and mother's and father's exhibits. DCFS asked the juvenile court to remove the children from parents. Counsel for M.E. joined with DCFS. Counsel for the siblings argued that they were differently situated than M.E. and should be returned to parents' custody. Parents' respective attorneys asked the court to return all three children to them and joined in the siblings' argument.

The juvenile court found that the siblings were differently situated than M.E. and a proper safety plan could be put in place to keep them in the family home. The court observed that father was prepared to participate in mental health services as part of a safety plan, and parents were not opposed to family preservation services and unannounced home visits.

The court found by clear and convincing evidence that there was a substantial danger to M.E.'s physical health and well-being

12

if returned to parents' custody, and there were no reasonable means to protect him without removal. The court ordered the siblings returned to parents.

The juvenile court also ordered DCFS to provide services to the family and to conduct unannounced home visits. The court granted mother and father monitored visits with M.E. consistent with his medical placement.

Parents appealed the juvenile court's jurisdictional and dispositional findings and orders.[6]

## DISCUSSION

Parents argue there was insufficient evidence to support the court's jurisdictional findings as to all three children and the dispositional order removing M.E. We disagree.

## 1. *Substantial Evidence Supported Jurisdiction*

The juvenile court found all three children dependent under section 300, subdivisions (b)(1), and (j). For reasons that we explain, we address only the subdivision (b)(1) and (j) counts related to medical neglect.[7]

### a. *Applicable Law*

"When a dependency petition alleges multiple grounds for its assertion that a minor comes within the dependency court's

---

[6] Although parents' notices of appeal state they also appeal from the denial of father's section 388 petition, in none of their briefs do parents make a substantive argument on that point. We therefore consider this issue waived. (*In re R.R.* (2010) 187 Cal.App.4th 1264, 1274, fn. 11.)

[7] As we have observed, the (b)-1 and (j) counts are identical, so the risk to M.E.'s siblings is also alleged in (b)-1. Nevertheless, because DCFS's position on jurisdiction over the siblings is based on the neglect of M.E., we believe it is more appropriate to review jurisdiction over the siblings in the context of section 300, subdivision (j).

13

jurisdiction, a reviewing court can affirm the juvenile court's finding of jurisdiction over the minor if any one of the statutory bases for jurisdiction that are enumerated in the petition is supported by substantial evidence.  In such a case, the reviewing court need not consider whether any or all of the other alleged statutory grounds for jurisdiction are supported by the evidence." (*In re Alexis E.* (2009) 171 Cal.App.4th 438, 451.)

Section 300, subdivision (b)(1) provides, in pertinent part, that a child may be declared dependent if "child has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness, as a result of the failure or inability of his or her parent or guardian to adequately supervise or protect the child, or the willful or negligent failure of the child's parent or guardian to adequately supervise or protect the child from the conduct of the custodian with whom the child has been left . . . ." "A jurisdictional finding under section 300, subdivision (b)(1), requires [the agency] to demonstrate the following three elements by a preponderance of the evidence:  (1) neglectful conduct, failure, or inability by the parent; (2) causation; and (3) serious physical harm or illness or a substantial risk of serious physical harm or illness." (*In re L.W.* (2019) 32 Cal.App.5th 840, 848.)

Section 300, "[s]ubdivision (j) applies if (1) the child's sibling has been abused or neglected as defined in specified other subdivisions and (2) there is a substantial risk that the child will be abused or neglected as defined in those subdivisions." (*In re I.J.* (2013) 56 Cal.4th 766, 774 (*I.J.*).)  " 'The broad language of subdivision (j) clearly indicates that the trial court is to consider the totality of the circumstances of the child and his or her sibling in determining whether the child is at substantial risk of harm, within the meaning of any of the subdivisions enumerated in subdivision (j).  The provision thus accords the trial court greater latitude to exercise jurisdiction as to a child whose sibling

14

has been found to have been abused than the court would have in the absence of that circumstance.'" (*Ibid.*)  "[T]he more severe the type of sibling abuse, the lower the required probability of the child's experiencing such abuse to conclude the child is at a substantial risk of abuse or neglect under section 300." (*Id.* at p. 778.)

"We review the record to determine whether there is any substantial evidence to support the juvenile court's conclusions, and we resolve all conflicts and make all reasonable inferences from the evidence to uphold the court's orders, if possible. However, substantial evidence is not synonymous with any evidence. . . .  [W]hile substantial evidence may consist of inferences, such inferences must be a product of logic and reason and must rest on the evidence . . . ; inferences that are the result of mere speculation or conjecture cannot support a finding." (*In re Drake M.* (2012) 211 Cal.App.4th 754, 763, internal quotation marks and citations omitted.)

We agree with DCFS that substantial evidence supports the juvenile court's jurisdictional finding under subdivision (b)(1) of medical neglect that endangered M.E. (count (b)-1) and under subdivision (j) for the siblings.  As such, we need not, and do not, address whether jurisdiction was also proper under the (b)-2 count.  (*In re Alexis E., supra,* 171 Cal.App.4th at p. 451.)

b.  *Substantial Evidence Supports Count (B)-1*

The record provided ample evidence of medical neglect. From the time M.E. was five years old, he had gained dangerously little weight while in his parents' care.  Based on M.E.'s BMI measurements, he degressed from mildly malnourished in January 2018 to severely malnourished in October 2019.  Parents acknowledged reoccurring problems with his G-tube feedings, but failed to seek prompt medical help to address the problem.  Instead, they repeatedly missed medical

15

appointments with pediatric specialists, appointments they knew were difficult to make. That M.E. thrived when removed from parents' care best illustrates the severity and cause of M.E.'s neglect. About a month after removal from his parents, M.E. had gained 10 pounds, was thriving developmentally, and learning to walk.

Parents failed to attend any follow-up appointments after the May 2018 removal of his tracheostomy tube, even though M.E.'s stoma opening continued to secrete mucus and had not been healing for well over a year after surgery. Nor had parents sought medical treatment for M.E.'s undescended testicles, even though they were repeatedly informed that he needed surgical intervention. There was substantial evidence that parents' medical neglect directly correlated to missed education opportunities for M.E. One example was M.E.'s failure to attend school for the fall 2019 semester.

To the extent parents fault medical providers for M.E.'s failure to thrive, the evidence indicates that it was parents who did not seek medical assistance for the G-tube failures, and it was parents who missed medical appointments when their child was in decline. The trial court reasonably could have found that parents' failure to act when their child was in need was the cause of severe malnourishment and deterioration.

c.     *Substantial Evidence Supports Count (j)*

The first element of section 300, subdivision (j) is fulfilled because substantial evidence supports the court's finding that M.E. has been neglected under subdivision (b). The totality of the circumstances provides substantial evidence that there is a substantial risk the siblings will be abused or neglected as defined in subdivision (b).

While the siblings did not have significant medical problems, there was substantial evidence of an ongoing risk to

16

their physical health and well-being evidenced by their brother's neglect. Parents failed to take the siblings to the dentist for two years and were the cause of the siblings' excessive absences and tardiness at school. This evidence, when considered in light of parents' denial of wrongdoing toward M.E., their failure to understand M.E.'s medical needs, and father's mental health problems, supports the reasonable inference that the siblings were at risk of physical and emotional harm, even if not to the degree suffered by M.E. As the juvenile court stated: "it's pretty clear that the lack of attention to [M.E.] has also led to a lack of attention to [the siblings] in terms of feeding, attentiveness to their needs, balancing out the demands of school, and deciding . . . what appointments might get missed."

We understand parents argue the evidence should be interpreted otherwise, but that misses the point. We "do not reweigh the evidence or exercise independent judgment, but merely determine if there are sufficient facts to support the findings of the trial court." (*I.J., supra,* 56 Cal.4th at p. 773, internal quotations omitted.) For example, that M.E. "had always been underweight and . . . in the '0 percentile' on growth charts since at least 2015," does not mean the trial court was obligated to credit that fact over the statements made by the nutritionist and doctors that we have reviewed. It is undisputed that M.E. was severely malnourished and deprived of an education in parents' custody, a condition that changed quickly and dramatically when M.E. was removed from parents.

Because we affirm jurisdiction based on the (b)-1 and (j) allegations, which cover jurisdiction over all three children, we do not address the (b)-2 count.

17

### 2. *Substantial Evidence Supported M.E.'s Removal from Parental Custody*

We review whether there was substantial evidence to support the court's removal order under the heightened standard of review set by our Supreme Court. (*Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1005.) When "presented with a challenge to the sufficiency of the evidence associated with a finding requiring clear and convincing evidence, the [appellate] court must determine whether the record, viewed as a whole, contains substantial evidence from which a reasonable trier of fact could have made the finding of high probability demanded by this standard of proof." (*Ibid.*)

Once the juvenile court determines that the child is described under section 300, it has discretion at the disposition hearing to remove the child from parental custody pursuant to section 361. The court may only remove the child if there "is or would be a substantial danger to the physical health, safety, protection, or physical or emotional well-being of the minor if the minor were returned home, and there are no reasonable means by which the minor's physical health can be protected without removing the minor from the minor's parent's . . . physical custody." (§ 361, subd. (c)(1).) "In making its disposition orders the court has broad discretion to resolve issues regarding the custody and control of the child, including deciding where the child will live while under the court's supervision." (*In re Anthony Q.* (2016) 5 Cal.App.5th 336, 346.)

Parents contend the court erred in removing M.E. from their custody. Father argues parents were "adequately caring for [M.E.], providing him with food, shelter and protection." As explained, the evidence was substantial that parents medically neglected M.E. and failed to provide him with sufficient food to the point that he became severely malnourished. The juvenile

18

court could reasonably conclude that returning M.E. to his parents' custody would pose an ongoing serious risk to his physical health, considering the M.E.'s complex medical needs and parents' insistence that they had done nothing wrong. (See *In re T.V.* (2013) 217 Cal.App.4th 126, 133 ["A parent's past conduct is a good predictor of future behavior."]; *In re Gabriel K.* (2012) 203 Cal.App.4th 188, 197 ["One cannot correct a problem one fails to acknowledge."].) The quick weight gain when placed away from parents was telling.

Mother and father also contend that there were reasonable alternatives to prevent M.E.'s removal. They insist the juvenile court could have avoided removal by ordering unannounced home visits, visits by the public health nurse, and participation in services. The juvenile court could have reasonably found otherwise: parents had a history of failing to cooperate with DCFS. At the inception of the case, father refused to participate in the investigation, causing DCFS to seek an investigative search warrant and an order for a forensic exam. Parents refused medical exams for the siblings. When DCFS obtained authorization for the children's removal, mother and father refused to disclose their location, and were initially uncooperative during the detention hearing when they provided an incorrect address for the children's whereabouts. Under these circumstances, and given M.E.'s considerable medical needs, the juvenile court could have reasonably concluded that there were no reasonable alternatives sufficient to protect M.E. in parents' custody.

Father also contends the juvenile court's removal findings were insufficient because the court failed to state the facts on which it based its conclusion that DCFS had made reasonable efforts to prevent or eliminate the need for removal. Section 361, subdivision (e) provides in part, "The court shall make a

19

determination as to whether reasonable efforts were made to prevent or to eliminate the need for removal of the minor from his or her home . . . . The court shall state the facts on which the decision to remove the minor is based." The record does not reflect that the juvenile articulated the factual basis for his express finding that "reasonable efforts were made to prevent to eliminate the need for removal." However, father did not lodge a contemporaneous objection to the juvenile court's failure to state its reasons. His claim of procedural error is thus forfeited. (*In re S.B.* (2004) 32 Cal.4th 1287, 1293 ["a reviewing court ordinarily will not consider a challenge to a ruling if an objection could have been but was not made in the trial court"], superseded by statute on other grounds as stated in *In re S.J.* (2008) 167 Cal.App.4th 953, 961–962.)[8]

## DISPOSITION

The court's jurisdictional finding, dispositional order, and order denying father's section 388 petition are affirmed.

RUBIN, P. J.

WE CONCUR:

BAKER, J.

KIM, J.

---

[8] Father also failed to object to any deficiencies in the DCFS social study submitted under California Rules of Court, rule 5.690. His argument on appeal on that ground is also forfeited.

20